## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.

AURELIANO A. ECHEVARRIA and MARIA
ECHEVARRIA OCHOA,

v.

EXPEDIA GROUP INC., EXPEDIA, INC.,
HOTELS.COM L.P., HOTELS.COM GP,
LLC, ORBITZ, LLC,

     defendants.

_____/

## COMPLAINT FOR DAMAGES

On January 1, 1959, Fidel Castro and his revolutionaries overthrew the government of Cuba and established a communist dictatorship in Cuba. The Castro regime then methodically stole all Cuban properties and private businesses from their rightful owners and transferred them to the state through systematic and massive property confiscations. The communist Cuban regime stole properties from the Cuevas Family,[1] among others. The Cuevas Family owned the island of Cayo Coco. For nearly six decades since those confiscations, the communist regime—and more recently, foreign and domestic companies, including the Iberostar Group ("Iberostar"), and defendants—have used, trafficked, and benefitted from Cayo Coco without permission from, or compensation to, the Cuevas Heirs.

After seizing Cayo Coco from the Cuevas Family, the Cuban government, together with various hotel chains, including Iberostar, began trafficking the resorts they built on the confiscated properties. Among these are the Iberostar Mojito and Iberostar Colonial (collectively, the "Trafficked Hotels").

Defendants[2] offered and sold reservations at the Trafficked Hotels through their Florida offices (where their Cuba group was based), employees, marketing campaigns, using a robust, interactive website by which they transacted business with Floridians around the clock. Every hour of every day, defendants engaged in internet and other marketing and promotional efforts aimed at and intended to lure and persuade Floridians to visit Cuba as tourists and stay in the Trafficked Hotels. The Cuevas Heirs bring this action to right the defendants' wrong of unlawful trafficking and for appropriate damages.

---

[1] Plaintiffs Aureliano A. Echevarría and Maria Echevarría Ochoa (the "Cuevas Heirs") are heirs to Cayo Coco.
[2] Defendants Expedia Group, Inc., Expedia, Inc., Hotels.com L.P., Hotels.com GP, LLC, and Orbitz, LLC are collectively referred to as the "Expedia defendants."

## THE ACTION

1.      The Cuevas Heirs sue the Expedia defendants under Title III of the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021, *et seq.* ("Title III" of the "LIBERTAD Act"), for unlawful trafficking of their confiscated real property in Cuba.

## THE PARTIES

*Plaintiffs*

2.      Aureliano A. Echevarría is a U.S. national as defined by 22 U.S.C. § 623(15) since May 22, 1984, and a natural person who resides in Miami, Florida. Mr. Echevarría owns an interest in and a claim to Cayo Coco, where the Trafficked Hotels are located.

3.      Maria Echevarria Ochoa is a U.S. national as defined by 22 U.S.C. § 623(15) since July 1, 1981, and a natural person who resides in Miami, Florida. Mr. Echevarría owns an interest in and a claim to Cayo Coco, where the Trafficked Hotels are located.

*The Expedia Defendants*

4.      Defendant Expedia Group, Inc. ("Expedia") is a Delaware corporation with its principal place of business in Bellevue, Washington, and offices in Miami, Florida.

5.      Defendant Expedia, Inc., is a Washington corporation with its principal place of business in Bellevue, Washington, and offices in Miami, Florida. It is a wholly owned subsidiary of Expedia. Defendant Expedia Group, Inc. and Defendant Expedia, Inc. have, at all relevant times, held themselves out as one and the same.

6.      Defendant Hotels.com L.P., an affiliate of Expedia, is a Texas limited partnership with headquarters in Dallas, Texas.

7.      Defendant Hotels.com GP, LLC, an affiliate of Expedia, is a Texas limited liability company with its headquarters in Bellevue, Washington. Hotels.com GP, LLC is the general partner of Hotels.com L.P.

8.      Defendant Orbitz, LLC, an affiliate of Expedia, is a Delaware limited liability company with its headquarters in Chicago, Illinois.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the LIBERTAD Act (22 U.S.C. § 6082).

10.     The Court has specific personal jurisdiction over defendants under Fla. Stat. §§ 48.193(1)(a)(1), (2) and (6), because they: operate, conduct, and carry on business in Florida; have offices in Florida; regularly avail themselves of the benefits of their presence in Florida; committed a tortious act within Florida causing injury to plaintiff who is Floridian; committed acts outside of Florida while engaging in solicitation within Florida; and because this case arises from defendants' business activity in Florida, tortious conduct in Florida, and tortious conduct outside Florida while engaging in solicitation in Florida, which satisfy minimum contacts and satisfy due process, as more fully set forth below.[3]

11.     Defendants' extensive trafficking activities in Florida go far beyond "merely" running robust, interactive websites aimed at Floridians to sell reservations at Cuban hotels built on stolen property, including the Trafficked Hotels—which alone would be enough. Defendants also: (1) maintain Florida offices from which hundreds of employees contacted Florida residents regarding Cuban hotels and reservations booked on defendants' websites; (2) maintain Florida

---

[3] The Eleventh Circuit, and other courts in this District also have found specific personal jurisdiction over the Expedia defendants for their trafficking of confiscated real property in Cuba. *E.g.*, *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1279 (11th Cir. 2022).

registrations and licenses to do business as sellers of travel in Florida; (3) sent direct emails to

Florida residents, urging them to complete reservations at Cuban hotels that they started on

defendants' websites and suggesting other hotels in other parts of Cuba; (4) sold and profited

from reservations by Floridians at Cuban hotels that stand on stolen property, including the

Trafficked Hotels; and (5) receive substantial revenues from Florida.

**A.    *Defendants Are Physically Present in Florida with Offices and Hundreds of Employees***

12.    Defendants carry on voluminous, ongoing, systematic, and substantial daily

business activity in Florida:

a.    Defendants maintain Florida offices from which hundreds of employees

work and from which they contact Florida residents and Cuban hotels regarding reservations

booked on defendants' websites. For example, Expedia Group has a 19,000 square feet office in

the 33-story, Bank of America tower at 701 Brickell Avenue for one of its divisions (not a

separate corporation), Expedia Group Media Solutions.[4]  That office has had more than one

hundred (100) employees[5] during the relevant time period and performed marketing services

relating to Latin America that permitted the "geo-target[ing]" of digital ads "to origin cities in

Florida," as more fully described below.

b.    Expedia Group Media Solutions, the Expedia Group marketing subsidiary

based in *Miami,* designs, implements, and provides metrics on marketing and solicitation,

---

[4] *See* Brian Bandell, *Inside Look: Expedia opens office on Brickell for nearly 100 employees*, S.
Fla. Bus. Journal (Jan. 13, 2016) https://www.bizjournals.com/southflorida/news/2016/01/12/
inside-look-expedia-opens-office-on-brickell-for.html. Moreover, Expedia Group Media
Solutions is a partner of Visit Florida, the state's official tourism marketing corporation to
promote tourism to Florida. In 2018 alone, Visit Florida's ads on Expedia channels yielded
nearly $600 million in bookings. *Visit Florida Honored with Expedia Group EPIC Award*,
https://www.visitfloridamedia.com/news/corporate-releases/visit-florida-honored-with-expedia-
group-epic-award.html (last visited July 17, 2024).
[5] *See id.*

including the use of "micro-targeting," through which it can pinpoint and direct marketing and

solicitation to particular geographic areas, down to city level. Expedia touts its ability to do so in

Florida.

        c.    Defendants do substantial business every day of the year in Florida,

including marketing, research, solicitation, sales and customer service aimed at Floridians.

        d.    Defendants communicated with hotels in Cuba from Florida, including the

Trafficked Hotels, regarding reservations booked on defendants' websites.

        e.    Defendants had a group based in Miami, Florida, dedicated to their

operations in Cuba. They referred to this group as "The Cuba Team."

        f.    The Cuba Team would contact defendants' "business partners" including

the Trafficked Hotels and the Cuban government for tourism and marketing purposes from

Miami.

        g.    Each of the Expedia defendants is registered with the Florida Department

of State to do business in Florida and has been for more than twenty years.[6]

        h.    Defendants Expedia, Inc., Hotels.com L.P., and Orbitz, LLC are registered

with the Florida Department of Agriculture and Consumer Services (FDACS) to do business in

Florida.[7]

---

[6] *See* copy of the Florida Department of State, Division of Corporations registration for the
Expedia Defendants, attached as **Composite Exhibit A**.
[7] Expedia, Inc. is registered under No. ST-31901; Hotels.com L.P. is registered under No. ST-
36670; and Orbitz, LLC is registered under No.  ST40542.

      i.      Expedia "has been a longtime partner with the Florida Chamber of Commerce" and "has a home here in Florida and has supported economic growth related to tourism . . . ."[8]

      j.      Defendants receive significant revenues from their activities in Florida.

**B.**      ***Defendants Conduct Their Trafficking in Florida and Target Floridians***

13.      Defendants directly target Floridians for advertising and marketing, *inter alia*, by using Expedia Group Media Solutions' touted ability to micro-target by geographic area.

14.      Defendants also target Floridians directly for advertising by use of Expedia Local Expert, through its more than 100 concierge service locations in Orlando, Florida.[9]

15.      Defendants configure their landing pages (web pages that users see upon entering defendants' websites) for Floridians who have searched for hotels in Cuba, including, on information and belief, the Trafficked Hotels, so those landing pages direct users to these and other Cuban hotels related to their search.

**C.**      ***Defendants Solicited, Marketed, and Made Sales to Floridians over Robust Interactive Websites Designed and Intended to Make Those Sales to Floridians***

16.      Defendants' websites are fully interactive, have robust internet e-business capabilities, and are fully accessible in Florida. Floridians can readily access defendants' websites and in 2019 were able to book hotel accommodations in Cuba at more than 6,500 hotels, including the Trafficked Hotels. Defendants' websites allowed Floridians to browse

---

[8] *See* https://www.flchamber.com/expedia-is-a-partner-in-florida-tourism/#:~:text=Expedia%20Group%2C%20along%20with%20our,strong%20partner%20in%20Florida%20tourism (last visited June 16, 2020).

[9] *See* https://www.newswire.com/news/transfirst-media-inc-partners-with-expedia-local-expert-orlando-16960243 (last visited June 16, 2020).

hotels by, among other things, geographic location (including Cayo Coco), by hotel operator (including Iberostar), and by hotel name (including the Trafficked Hotels).

17.     Having located a hotel in Cuba on one of the defendants' websites, Floridians were readily able to determine whether rooms were available on their preferred dates, at what price and with what features (e.g., types of rooms, beds, views, etc.), and could reserve rooms on defendants' websites using a U.S. credit card. If Floridians did not reserve a room after browsing defendants' websites, defendants would target and send them "you forgot something" emails and emails with other hotel options in Cuba. In short, defendants targeted Floridians by sending them emails urging them to book rooms at hotels in Cuba, including the Trafficked Hotels.

18.     Defendants promoted their websites—and their interactive capabilities for booking rooms at Cuban hotels, including the Trafficked Hotels—to Floridians in the following ways:

a.     through their search engine optimization (SEO) efforts, including by developing titles and meta description tags to optimize the titles, and "snippets" that appeared on Google and other search engine results pages;

b.     through their follow-up emails to Floridians who searched for accommodations in Cuba, including the Trafficked Hotels or other geographically proximate hotels; and

c.     through banner ads promoting popular destinations in Cuba that directed Floridians to additional information and booking of Cuban hotels, including the Trafficked Hotels.

### D. Defendants' Florida Contacts Resulted in Reservations at the Trafficked Hotels

19.    As a direct result of defendants' continuous and systematic contacts with Florida and their widespread, targeted efforts to promote and sell reservations to Floridians through their Florida operations and interactive websites:

   a.    Defendants made a substantial number of sales to Floridians, including sales of reservations at the Trafficked Hotels, during the relevant time period. Defendants' obtained substantial revenue from these sales in Florida to Floridians.

   b.    Defendants received commissions for each of those reservations. That commission revenue is substantial.

20.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and (3).

## THE LIBERTAD ACT

21.    The LIBERTAD Act was passed on March 12, 1996, with an effective date of August 1, 1996. It expressly provides former Cuban nationals who are now U.S. Nationals (i.e., citizens) with a claim for damages to deter the exploitation and trafficking of confiscated property in Cuba, and "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro Regime." 22 U.S.C. § 6022(6).

22.    Title III of the LIBERTAD Act provides U.S. nationals with a cause of action against those who traffic their confiscated Cuban property, 22 U.S.C. § 6023(13), or benefit from trafficking that property. *Id.* at §§ 6081-6085. Title III's effective date, August 1, 1996, was never suspended.  Liability for trafficking under Title III began ninety days later, on November 1, 1996.

23.    Since the LIBERTAD Act's passage in 1996, defendants have been on notice that trafficking in property confiscated by the Cuban regime without the authorization of the owner of a claim to such property and without compensation would subject them to liability under Title

III, which has historical antecedents in claims for unjust enrichment and the unauthorized economic exploitation of property. Title III of the LIBERTAD Act was passed to provide an effective remedy for this infringement of property rights.

## FACTUAL ALLEGATIONS

### A.  The Cuevas Property

24.     The LIBERTAD Act expressly defines "property" to include "any property . . . whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein . . . ."  *Id.* at § 6023(12)(A).

25.     The LIBERTAD Act defines the term "confiscated" to include the "nationalization, expropriation, or other seizure by the Cuban government of ownership or control of property, on or after January 1, 1959—(i) without the property having been returned or adequate and effective compensation provided." 22 U.S.C. § 6023(4)(A)(i).

26.     The Cuevas family owned Cayo Coco—an island off the North Coast of Cuba, near the city of Morón. The Cuevas Property comprises 370 square kilometers and is bordered by Morón to the South, Cayo Romano to the East, the Atlantic Ocean to the North, and Cayo Guillermo to the West. It is connected to Cuba's mainland near Morón by a 17-km long causeway, and to the world at large by Jardines del Rey International Airport.

27.     The Cuevas Heirs' predecessors in interest continuously owned, possessed, and used the Cuevas Property until the communist regime confiscated it the 1960s. Thereafter, many of the family members, including the Cuevas Heirs and their predecessors, fled Cuba.

28.     The Cuban government maintains possession and control of Cayo Coco and never returned it or paid any compensation to the Cuevas Heirs or their family for its seizure.

29.     The Cuban government, together with Iberostar, operated the Trafficked Hotels on Cayo Coco, and the Trafficked Hotels were the subject of dealings between defendants and the Cuban government.

30.     In large part, defendants solicited and sold reservations at the Trafficked Hotels from and to Floridians. Floridians could reserve rooms and vacation packages at the Trafficked Hotels from defendants' websites.

31.     The Cuevas Heirs never abandoned their legitimate interest in and claim to Cayo Coco.

*Succession Rights to Cayo Coco*

32.     Cayo Coco, when acquired by Julián Cuevas and his wife, Isabel Angulo, from Isabel's father, was virgin property, undeveloped and reserved for the family's use.

33.     Isabel Angulo and Julián Cuevas died in Cuba in 1885 and in 1930, respectively. Julián Cuevas did not re-marry after his wife's death and his 100% ownership interest in Cayo Coco passed by will to his five surviving children, Emilio Cuevas, Julio Cuevas (also known as Julián Cuevas), Maria Teresa Cuevas, Carmen Cuevas, and Elvira Cuevas.

34.     Emilio Cuevas died intestate in Cuba in 1934, and his interest in Cayo Coco passed through intestacy under Cuban law to his surviving children.

35.     Julio Cuevas and Maria Teresa Cuevas died in Cuba intestate, unmarried and childless in 1936 and 1956, respectively. The interest of Julio Cuevas in Cayo Coco passed through intestacy under Cuban law to his surviving siblings, Maria Teresa Cuevas, Elvira Cuevas, and Carmen Cuevas, and to Emilio Cuevas' children. The interest of Maria Teresa Cuevas in Cayo Coco passed through intestacy under Cuban law to her surviving siblings, Elvira Cuevas, and Carmen Cuevas, and to Emilio Cuevas' children.

36.     Elvira Cuevas died intestate in 1959 in Cuba. She was predeceased by her husband Aureliano Echevarría, did not re-marry and was survived by two children, Rosa Elvira Echevarría and Julián Echevarría, who inherited her interest in Cayo Coco through Cuban intestacy law.

37.     Carmen Cuevas died intestate in Cuba, unmarried and childless, in or about 1962. Her interest in Cayo Coco passed to the children of Elvira Cuevas and Emilio Cuevas through Cuban intestacy law.

38.     Rosa Elvira Echevarría died intestate in 1985 in Miami. She was predeceased by her husband, did not re-marry and died childless. Her interest in Cayo Coco passed to her surviving sibling, Julián Echevarría, through Florida intestacy law.

39.     Julián Echevarría died intestate in 1987 in Miami. Upon his death, his interest in Cayo Coco passed under Florida intestacy law in two equal parts, one to his wife, Cira Marquez, the other in five equal parts: four to his surviving children, Carlos, Mario, Julio and Carmen; and one part to Aureliano A. and Maria, the children of Aureliano Echevarría who had died in 1985. Cira Marquez died in 1993 in Miami intestate. Marquez did not remarry and, upon her death, her remaining interest in Cayo Coco passed under Florida intestacy law to her three surviving children, and to Aureliano A. and Maria, the children of Aureliano Echevarría.

40.     At all times since Cayo Coco was confiscated, including the date on which this case was filed, the Cuevas family and subsequently the Cuevas Heirs have been the rightful owners of the claim to Cayo Coco.

41.     The Cuevas Family was not eligible to file a claim with the Foreign Claims Settlement Commission under Title V of the International Claims Settlement Act of 1949 (22 U.S.C. § 1643, *et seq*.), because they were not U.S. citizens when Cayo Coco was confiscated.

42.    The Cuevas Family never authorized any of the defendants to use or benefit from the use of the Trafficked Hotels, and the Cuevas Family has not received a penny for that use from the defendants, or any other person or entity.

**B.  The Expedia Defendants' Trafficking**

43.    Title III of the LIBERTAD Act defines a person who "traffics in confiscated property" as one who:

> knowingly and intentionally— . . . (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or (iii) . . . participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property.

22  U.S.C. § 6023(13)(A).

44.    From at least June 2017, the Expedia Defendants knowingly and intentionally participated in trafficking Cayo Coco, which had been confiscated by the communist Cuban government and on which the Trafficked Hotels stand.

45.    Expedia Gorup is the corporate parent company of numerous brands, including Expedia, Inc., Hotels.com and Orbitz. In fact, Expedia lists a total of 21 subsidiaries or affiliates, through which it maintains more than 200 travel booking sites across more than 70 countries, and through which it offers more than 1 million properties for rent.



https://www.expediagroup.com/about/

46.     According to Expedia Group's February 2024 10-K Report, the Expedia
Defendants "make travel products and services available both on a stand-alone and package
basis, primarily through the following business models: the merchant model, the agency model
and the advertising model." Expedia Group, Inc., *Form 10-K for the Year Ended Dec. 31, 2023*

(Feb. 9, 2024), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001324424/1d1b7ef4-fd87-4efa-
a8fd-f728746142d1.pdf.

> Under the merchant model, we facilitate the booking of hotel rooms, alternative
> accommodations, airline seats, car rentals and destination services from our travel
> suppliers and we are the merchant of record for such bookings. . . .[T]he majority
> of our merchant transactions relate to lodging bookings. Under the agency model,
> we facilitate travel bookings and act as the agent in the transaction, passing
> reservations booked by the traveler to the relevant travel provider. We receive
> commissions or ticketing fees from the travel supplier and/or traveler.
>
> *       *       *
>
> Under the advertising model, we offer travel and non-travel advertisers access to a
> potential source of incremental traffic and transactions through our various media
> and advertising offerings across several of our travel-based websites, as well as our
> majority-owned metasearch site, trivago.

*Id*. at 6.

47.     Defendant Expedia's 10-K Report describes its business as follows:

> Expedia Group, Inc. and its subsidiaries provide travel products and services to
> leisure and corporate travelers in the United States and abroad as well as various
> media and advertising offerings to travel and non-travel advertisers. These travel
> products and services are offered through a diversified portfolio of brands
> including: Brand Expedia®, Hotels.com®, Expedia® Partner Solutions, Vrbo®,
> trivago®, Orbitz®, Travelocity®, Hotwire®, Wotif®, ebookers®,
> CheapTickets®, Expedia Group™ Media Solutions, CarRentals.com™ and
> Expedia Cruises. In addition, many of these brands have related international
> points of sale. We refer to Expedia Group, Inc. and its subsidiaries collectively as
> "Expedia Group," the "Company," "us," "we" and "our" in these consolidated
> financial statements.

*Id.* at F-9.

48.     During the relevant time period, the Expedia Defendants provided online booking

services for hotels in Cuba, including the Trafficked Hotels. For example, in 2019, Expedia.com

listed a total of **5,073** properties available for rent throughout Cuba. *See* Screenshot of Expedia

Mobile Application, attached as **Exhibit B.** Those properties included the Trafficked Hotels.

49.     In addition to directly benefitting from the Trafficked Properties by receiving commissions or other fees for booking rooms at the Trafficked Hotels, defendants also derived an indirect benefit from the Trafficked Hotels by receiving advertising revenues driven by or related to their offer and sale of reservations at the Trafficked Hotels.

50.     On information and belief, defendants sold reservations to customers (including Floridians) who traveled to Cuba, and to the Trafficked Hotels in particular, for tourism, which is not a permitted purpose of travel to Cuba under U.S. Treasury Department regulations, and ***was not*** lawful travel.

51.     The Expedia Defendants advertised hotels in Cuban locations by sending emails to Floridians who had searched for accommodations and offering them "fantastic deals."[10]

52.     The Expedia Defendants also advertised hotels in Cuba, including Cayo Coco, to Floridians for tourism, in violation of the U.S. Treasury Department regulations:

> **All-Inclusive Hotels and Accommodations in Cayo Coco**
>
> Finding the perfect all-inclusive hotel for your trip to Cayo Coco has never been so simple, and with the vast amount of choices on our site you won't be disappointed. Cayo Coco offers a host of things to see and do such as Cayo Coco Beach. Browse our choice of all-inclusive hotels where you can enjoy a host of amenities such as entertainment, kid's clubs, and of course food and beverages all included in your room rate. Many of our all-inclusive resorts also feature activities such as golf, yoga, water sports, and more, which you can enjoy without any additional cost. Expedia even has hotels with all-inclusive room rates and we have a long list to choose from. If you have seen some hotels but need a little more time deciding, you can save them to your favorites, so you don't lose track of the best options for your stay. From all-inclusive resorts to all-inclusive hotel rooms, Expedia has it all, and it's only a click away.

*See* screenshot of Expedia's landing page after a google search from Florida by a Floridian for adventure hotels in Cayo Coco, attached as **Exhibit D**; *see* screenshot of Expedia's offering

---

[10] See **Exhibit C** email to Manuel Vazquez dated August 17, 2019.

reservations at "Top Cuba Fishing Resorts and & Hotels," from an online search done in Florida

by a Floridian, attached as **Exhibit E**; *see also* screenshot of Expedia's touting "All-inclusive

hotels and accommodations in Cayo Coco. Finding the perfect all-inclusive hotel for your trip to

Cayo Coco has never been so simple, . . . ." from an online search done in Florida by a Floridian,

attached as **Exhibit F**.

     53.    Expedia.com also told Floridians that Cayo Coco was known for its tours and

entertainment, and that "travelers like [the Cuevas Property]!":

> **Sightseeing In and Around Cayo Coco**
>
> Venture out to Cayo Coco Beach and Cayo Guillermo Marina and see why travelers like Cayo
> Coco! Other attractions include Cayo Guillermo Beach, Laguna la Redonda, and Laguna de
> Leche.
>
> > **Cayo Coco is also known for its:**
>
> > - White sand beaches
> > - Tours
> > - Entertainment

*See* **Exhibit D** (In promoting "Tours," defendants necessarily promoted tourism.). The Expedia

Defendants' promotion and advertisement to Floridians of hotels in Cayo Coco for tourism

violated U.S. Treasury Department regulations.

### *Defendants' Knowledge and Intentionality*

     54.    The Expedia Defendants' knowing and intentional conduct regarding the

Trafficked Properties and Hotels constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A).

     55.    Ever since the LIBERTAD Act was passed in 1996, defendants have been on

notice that trafficking in the Trafficked Properties would subject them to liability:

> I will allow Title III to come into force. ***As a result, all companies doing business
> in Cuba are hereby on notice that by trafficking in expropriated American***

> *property, they face the prospect of lawsuits and significant liability in the United States*.
>
> \*     \*     \*
>
> Our allies and friends will have a strong incentive to make real progress because, *with Title III in effect, liability will be established irreversibly during the suspension period and suits could be brought immediately when the suspension is lifted*. And for that very same reason, foreign companies will have a strong incentive to immediately cease trafficking in expropriated property, the only sure way to avoid future lawsuits.

President's Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1995, 32 Weekly Comp. Pres. Doc. 1265 (July 16, 1996) (G.P.O. authenticated version available at www.govinfo.gov/content/pkg/WCPD-1996-07-22/pdf/WCPD-1996-07-22-Pg1265.pdf), attached as **Exhibit G** (emphasis added). President Clinton's statement rendered defendants' conduct knowing and intentional as a matter of law.

56.     Defendants knew or had reason to know they were trafficking confiscated property, which satisfies Title III's element of intentional conduct.[11] No "bad intent" was required, only intentional, i.e., non-accidental conduct.

57.     On June 20, 2019, the Echevarria family gave defendants' hotel partner, Iberostar, notice of their intent to commence a class action unless Iberostar ceased trafficking their property and the properties of putative class members. *See* **Exhibit H**.

58.     On August 6, 2019, the Echevarria family gave defendants notice of their intent to add them as defendants in a class action unless defendants ceased trafficking the Iberostar hotels in Cayo Coco. *See* **Composite Exhibit I.**

---

[11] Title III expressly recognizes that "[m]illions of [Cuban] citizens," "thousands of United States nationals," and "thousands more Cubans" who arrived in the United States and "later became naturalized citizens of the United States," had their property confiscated after the Castro regime seized power and began "trampl[ing] on the fundamental rights of the Cuban people." 22 U.S.C. § 6081(3). *See* https://cri.fiu.edu/us-cuba/chronology-of-us-cuba-relations/.

59.     Despite knowing or having reason to know they were trafficking confiscated property at all times after the LIBERTAD Act's passage in 1996, after notice to their hotel partner on June 20, 2019, after express notice on August 6, 2019, and after being sued in January 2020, *Echevarría v. Expedia, Inc.*, No. 19-cv-22621-FAM (S.D. Fla.), defendants continued to engage in commercial activity at the Trafficked Hotels for their economic benefit.

60.     The Expedia Defendants' knowing and intentional conduct regarding the confiscated, Trafficked Properties constituted trafficking as defined by 22 U.S.C. § 6023(13)(A).

### *Defendants' Lack of Authorization*

61.     Neither the Cuevas Heirs nor any other U.S. national who may have had a claim to the Trafficked Properties ever authorized the Cuban government or the defendants to traffic their properties.

### *Defendants' Failure to Pay Compensation to Plaintiffs*

62.     Defendants have never paid—and the Cuevas Heirs have never received—any compensation whatsoever for defendants' trafficking of the Trafficked Properties.

**C.      The Cuevas Heirs' Injury**

63.     The Cuevas Heirs' claims arise from defendants' Florida advertising, solicitations and sales of rooms to Floridians at the Trafficked Hotels.

64.     The Cuevas Heirs' injury is defendants' trafficking in the Trafficked Properties, which constitutes an invasion of a legally protected interest.

65.     Defendants' offering of and sale of reservations at the Trafficked Hotels constitutes a concrete and tangible infringement on the Cuevas Heirs' property rights.

66.     The Cuevas Heirs suffered their injuries in Florida, where they reside.

67.     The Cuevas Heirs' injuries are real, tangible and concrete because they received

no benefit from their interest in the Trafficked Properties, which defendants trafficked for

money, without the Cuevas Heirs' consent and without paying them any compensation.[12]

68.     Because of defendants' unlawful trafficking of the Trafficked Properties,

defendants are liable to the Cuevas Heirs for all money damages recoverable under 22 U.S.C. §

6082(a).

## COUNT I
## Private Right of Action Under 22 U.S.C. § 6082(a)(1)

69.     The Cuevas Heirs incorporate by reference paragraphs 1 to 68 as if fully set forth

here.

70.     These claims are brought under Title III of the LIBERTAD Act, 22 U.S.C. §

6082.

71.     Defendants are "persons" as defined by 22 U.S.C. § 6023(11).

72.     Cayo Coco was confiscated by the communist Cuban government after January 1,

1959.

73.     Since the date on which Cayo Coco was confiscated, and long before March 12,

1996 (Title III's "Record Date"), the Cuevas Heirs and their predecessors have owned claims to

Cayo Coco.

---

[12] Title III makes clear that "[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner," 22 U.S.C. §§ 6081(2)-(3), by foreign investors who traffic in confiscated properties "complicate any attempt to return [these expropriated properties] to their original owners," 22 U.S.C. §§ 6081(5), (7), and undermine U.S. foreign policy aiming "to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government," *id.* § 6081(6)(B).

74.     Within the applicable limitations period, defendants knowingly and intentionally used or benefitted, directly or indirectly, from the confiscated properties by soliciting and selling, for economic benefit, reservations at the Trafficked Hotels, which constitutes trafficking that violates Title III of the LIBERTAD Act.

75.     Defendants conducted this trafficking "without the authorization of any United States national who holds a claim to the property" (22 U.S.C. § 6023(13)) in violation of Title III of the LIBERTAD Act.

76.     The Cuevas Heirs, in compliance with 22 U.S.C. §§ 6082 (a)(3)(B) and (a)(3)(D), gave defendants notice of their intent to sue them more than 30 days before joining them as defendants in this action. Notwithstanding this notice, defendants continued to knowingly and intentionally traffic the Trafficked Hotels after receiving the notice.

77.     Accordingly, the Cuevas Heirs have a right to recover damages, in an amount determined under 22 U.S.C. §§ 6082(a)(1)(A)(i) and 6082(a)(3)(C), together with attorneys' fees and costs under 22 U.S.C. § 6082(a)(1)(A)(ii), and treble damages under 22 U.S.C. § 6082(a)(3).

78.     This action was commenced after the United States Government lifted its twenty-three (23) year suspension of the right to bring this action under Title III, 22 U.S.C. § 6085, which authorized plaintiffs to pursue this claim and obtain the relief requested here.

79.     The Cuevas Heirs were Putative Class Members in *Echevarría v. Expedia, Inc.*, No. 19-cv-22621-FAM (S.D. Fla.). Class certification in that case was denied on July 16, 2024. *D. Id.* at ECF No. 234. That class action, filed June 24, 2019, tolled the time for individual Class Members to file individual cases on all issues. *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 560-61 (1974) (Because "[t]he class suit . . . was filed with 11 days yet to run in the period . . . the intervenors thus had 11 days after the entry of the order denying them participation in the suit

as class members in which to move for permission to intervene."); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 345 (1983) (applying *American Pipe* to individual suits brought by putative class members after denial of class certification); *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1391 (11th Cir. 1998) ("If class certification is denied in whole or in part . . . those putative class members who were excluded from the class . . . [must] file a separate individual action . . . before the time remaining in the limitations period expires.").

## PRAYER FOR RELIEF

For all these good reasons, the Cuevas Heirs demand judgment against defendants that awards actual damages under 22 U.S.C. § 6082(a)(1)(A)(i), together with attorneys' fees and costs under 22 U.S.C. § 6082(a)(1)(A)(ii), treble damages under 22 U.S.C. § 6082(a)(3)(C), appropriate post-judgment interest, and all other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Cuevas Heirs demand trial by jury on all issues so triable.

Dated: February 14, 2025

Respectfully submitted,

**RIVERO MESTRE LLP**
2525 Ponce de León Blvd., Suite 1000
Coral Gables, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
E-mail: arivero@riveromestre.com
E-mail: arolnick@riveromestre.com
E-mail: amalave@riveromestre.com

By:      */s/ Andrés Rivero*
ANDRÉS RIVERO
Florida Bar No. 613819
ALAN H. ROLNICK
Florida Bar No. 715085
ANA MALAVE
Florida Bar No. 83839

22

and

MANUEL VAZQUEZ
Florida Bar No. 132826
**MANUEL VAZQUEZ, P.A.**
2332 Galiano St., Second Floor
Coral Gables, Florida 33134
Telephone: (305) 445-2344
Facsimile: (305) 445-4404
E-mail: mvaz@mvazlaw.com

By:    */s/ Manuel Vazquez*
MANUEL VAZQUEZ
Florida Bar No. 132826